# EXHIBIT A

1710184

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**    **Maureen K. Ohlhausen, Acting Chairman**
                      **Terrell McSweeny**

_____
                                        )
**In the Matter of**                    )
                                        )
**Alimentation Couche-Tard Inc.,**      )          **Docket No. C-4635**
   **a corporation; and**       )
                                        )
**CrossAmerica Partners LP,**           )
   **a limited partnership.**     )
_____)

## DECISION AND ORDER
### [Public Record Version]

The Federal Trade Commission ("Commission"), having initiated an investigation of the proposed acquisition by Respondent Alimentation Couche-Tard Inc. ("ACT") (through its wholly owned subsidiary Oliver Acquisition Corp.) of certain equity interests of Holiday Companies subsidiaries, and ACT and its affiliate CrossAmerica Partners LP (together, "Respondents") having been furnished thereafter with a copy of a draft of the Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts set forth in the aforesaid draft of the Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it had reason to believe that Respondents have violated the said Acts, and that a Complaint should issue stating its charges in that respect, and having thereupon issued and served its Complaint and Order to Maintain Assets, and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, and having duly considered the comment received from an interested person, and having modified the Decision and Order in certain respects, now in further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the

Commission hereby makes the following jurisdictional findings and enters the following Decision and Order ("Order"):

1.      Respondent Alimentation Couche-Tard Inc. is a corporation organized, existing, and doing business under, and by virtue of, the laws of Canada, with its office and principal place of business located at 4204 Industriel Blvd., Laval, Quebec H7L 0E3, Canada, and its United States address for service of process and of the Complaint, the Decision and Order, and the Order to Maintain Assets, as follows:  Corporate Secretary, Circle K Stores Inc., 1130 W. Warner Road, Tempe, Arizona 85284.

2.      Respondent CrossAmerica Partners LP is a limited partnership organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business located at 515 Hamilton Street, Suite 200 Allentown, Pennsylvania 18101.

3.      The Federal Trade Commission has jurisdiction over the subject matter of this proceeding and over the Respondents and the proceeding is in the public interest.

## ORDER

## I.

**IT IS HEREBY ORDERED** that, as used in this Order, the following definitions shall apply:

A.      "ACT" means Alimentation Couche-Tard Inc., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates, in each case controlled by ACT (including Circle K Stores Inc., Oliver Acquisition Corp., and CrossAmerica Partners LP), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B.      "CAPL" means CrossAmerica Partners LP, its partners, directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates, in each case controlled by CAPL, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

C.      "Holiday" means Holiday Companies, a corporation organized, existing, and doing business under, and by virtue of the laws of the State of Minnesota, with its office and principal place of business located at 4567 American Boulevard West, Minneapolis, Minnesota 55437.

D.      "Commission" means the Federal Trade Commission.

E.      "Acquirer" means any Person that acquires any of the Retail Fuel Assets pursuant to this Order.

F.    "Acquisition" means the proposed acquisitions described in the Equity Interest Purchase Agreement by and between Holiday Companies and Oliver Acquisition Corp., dated as of July 10, 2017.

G.    "Acquisition Date" means the date the Acquisition is consummated.

H.    "Books and Records" means all originals and all copies of any operating, financial, environmental, governmental compliance, regulatory, or other information, documents, data, databases, printouts, computer files (including files stored on a computer's hard drive or other storage media), electronic files, books, records, ledgers, papers, instruments, and other materials, whether located, stored, or maintained in traditional paper format or by means of electronic, optical, or magnetic media or devices, photographic or video images, or any other format or media, relating to the Retail Fuel Assets, including, but not limited to, real estate files; environmental reports; environmental liability claims and reimbursement data, information, and materials; underground storage tank (UST) system registrations and reports; registrations, licenses, and permits (to the extent transferable); regulatory compliance records, data, and files; applications, filings, submissions, communications, and correspondence with Governmental Entities; inventory data, records, and information; purchase order information and records; supplier, vendor, and procurement files, lists, and related data and information; credit records and information; account information; marketing analyses and research data; service and warranty records; warranties and guarantees; equipment logs, operating guides and manuals; employee lists and contracts, salary and benefits information, and personnel files and records (to the extent permitted by law); financial statements and records; accounting records and documents; telephone numbers and fax numbers; and all other documents, information, and files of any kind that are necessary for an Acquirer to operate the Retail Fuel Outlet Business(es) in a manner consistent with the purposes of this Order.

I.    "Confidential Business Information" means all information owned by, or in the possession or control of, Respondents that is not in the public domain and to the extent that it is related to or used in connection with the Retail Fuel Assets or the conduct of the Retail Fuel Outlet Business(es).  The term "Confidential Business Information" excludes the following:

    1.    Information that is contained in documents, books, or records of Respondents that is provided to an Acquirer that is unrelated to the Retail Fuel Assets or that is exclusively related to the Respondents' retained businesses; and

    2.    Information that (a) is or becomes generally available to the public other than as a result of disclosure in breach of the prohibitions of this Order; (b) is or was developed independently of, and without reference to, any Confidential Business Information; (c) is necessary to be included in Respondents' mandatory regulatory filings; (d) the disclosure of which is consented to by an Acquirer; (e) is necessary to be exchanged in the course of consummating the Acquisition or transactions

3

pursuant to the Divestiture Agreement; (f) is disclosed in complying with the Order; (g) the disclosure of which is necessary to allow Respondents to comply with the requirements and obligations of the laws of the United States and other countries, and decisions of Governmental Entities; or (h) is disclosed in obtaining legal advice.

J. "Consent" means any approval, consent, ratification, waiver, or other authorization.

K. "Contract(s)" means all agreements, contracts, licenses, leases (including, but not limited to, ground leases and subleases), consensual obligations, binding commitments, promises and undertakings (whether written or oral and whether express or implied), whether or not legally binding.

L. "Cost" means costs not to exceed the actual cost of labor, goods and material, travel, third party vendors, and other expenditures that are directly incurred by Respondents to provide and fulfill any Transition Services; *provided, however*, that with respect to the transitional supply of Fuel Products, Fuel Products Cost shall be calculated net of any rebates, RIN sharing, or other discounts or allowances and shall not include any mark-up, profit, overhead, minimum volume penalties, or other upward adjustments by Respondents.

M. "Divestiture Agreement" means any agreement between Respondents (or between a Divestiture Trustee) and an Acquirer to divest the Retail Fuel Assets and any ancillary agreements relating to the divestiture of the relevant assets (such as for the provision of Transition Services) that has been approved by the Commission pursuant to this Order, including all amendments, exhibits, agreements, and schedules thereto.

N. "Divestiture Date" means the date on which Respondents (or the Divestiture Trustee) close on a transaction to divest the Retail Fuel Assets.

O. "Divestiture Trustee" means the Person appointed by the Commission pursuant to Paragraph VI. of this Order.

P. "Equipment" means all tangible personal property (other than Inventory(ies)) of every kind owned or leased by Respondents in connection with the operation of the Retail Fuel Outlet Business associated with the Retail Fuel Assets at each of the locations specified in Appendix A to this Order, including, but not limited to all: fixtures, furniture, computer equipment and third-party software, office equipment, telephone systems, security systems, registers, credit card systems, credit card invoice printers and electronic point of sale devices, money order machines and money order stock, shelving, display racks, walk-in boxes, furnishings, signage, canopies, fuel dispensing equipment, UST systems (including all fuel storage tanks, fill holes and fill hole covers and tops, pipelines, vapor lines, pumps, hoses, Stage I and Stage II vapor recovery equipment, containment devices, monitoring equipment, cathodic protection systems, and other elements associated with any of the foregoing), parts, tools, supplies, and all other items of equipment or tangible personal property of any nature or other systems used in the

operation of the Retail Fuel Outlet Business associated with the Retail Fuel Assets at each of the locations specified in Appendix A to this Order, together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof, to the extent such warranty is transferrable, and all maintenance records and other documents relating thereto.

Q.     "Fuel Products" means refined petroleum gasoline and diesel products.

R.     "Governmental Entity" means any federal, state, local, or non-U.S. government, or any court, legislature, governmental agency or commission, or any judicial or regulatory authority of any government.

S.     "Governmental Permit(s)" means all Consents, licenses, permits, approvals, registrations, certificates, rights, or other authorizations from any Governmental Entity(ies) necessary to effect the complete transfer and divestiture of the Retail Fuel Assets to an Acquirer and for such Acquirer to operate any aspect of a Retail Fuel Outlet Business.

T.     "Inventories" means all inventories of every kind and nature for retail sale associated with the Retail Fuel Assets, including: (1) all Fuel Products, kerosene, and other petroleum-based motor fuels stored in bulk and held for sale to the public; and (2) all usable, non-damaged and non-out of date products and items held for sale to the public, including, without limitation, all food-related items requiring further processing, packaging, or preparation and ingredients from which prepared foods are made to be sold.

U.     "Monitor" means any Person appointed by the Commission to serve as a Monitor pursuant to Paragraph V. of this Order or Paragraph IV. of the Order to Maintain Assets.

V.     "Order to Maintain Assets" means the Order to Maintain Assets incorporated into and made a part of the Consent Agreement.

W.     "Person" means any individual, or any partnership, joint venture, firm, corporation, limited liability company, limited liability partnership, joint stock company, association, trust, unincorporated organization, or other business entity.

X.     "Prior Notice Outlet" means (i) the Retail Fuel Assets and (ii) any existing retail fuel facility (including any successors) identified in Non-Public Appendix B.

Y.     "Products" means any Fuel Products or merchandise products relating to the Retail Fuel Outlet Business(es).

Z.     "Proposed Acquirer" means any proposed acquirer of any of the Retail Fuel Assets that Respondents or the Divestiture Trustee intend to submit or have submitted to the Commission for its approval under this Order.

AA.    "Respondents' Brands" means all of Respondents' trademarks, trade dress, logos, service marks, trade names, brand names, and all associated intellectual property rights, including rights to the names "Circle K," "Freedom Valu," and "Holiday."

BB.    "Retail Fuel Assets" means all of Respondents' right, title, and interest  in and to all property and assets, real, personal, or mixed, tangible and intangible, of every kind and description, wherever located, relating to, used in, or reserved for use in, the Retail Fuel Outlet Business, including, but not limited to:

1.    All real property interests (including fee simple interests and real property leases and leasehold interests), including all easements and rights-of-way, together with all buildings and other structures, facilities, appurtenances, and improvements located thereon or affixed thereto (including all attached machinery, fixtures, and heating, plumbing, electrical, lighting, ventilating and air-conditioning equipment), whether owned, leased, or otherwise held;

2.    All Equipment, including any Equipment removed from any location of the Retail Fuel Outlet Business since the date of the announcement of the Acquisition and not replaced;

3.    All Inventories;

4.    All Contracts and all outstanding offers or solicitations to enter into any Contract, and all rights thereunder and related thereto, to the extent transferable, and at the Acquirer's option;

5.    All Governmental Permits, and all pending applications therefor or renewals thereof, to the extent transferable;

6.    All intangible rights and property, including intellectual property, owned or licensed (as licensor or licensee) by Respondents (to the extent transferable or licensable), going concern value, goodwill, and telephone and telecopy listings; and

7.    Books and Records; *provided, however,* that in cases in which Books and Records included in the Retail Fuel Assets contain information: (a) that relates both to the Retail Fuel Assets and to other, retained businesses of Respondents and cannot be segregated in a manner that preserves the usefulness of the information as it relates to the Retail Fuel Assets, or (b) where Respondents have a legal obligation to retain the original copies, then Respondents shall be required to provide only copies of the materials containing such information with appropriate redactions to the Acquirer.  In instances where such copies are provided to an Acquirer, the Respondents shall provide to such Acquirer access to original materials under circumstances where copies of materials are insufficient for regulatory or evidentiary purposes;

*Provided, however,* that the Retail Fuel Assets need not include the Retained Assets.

CC.    "Retail Fuel Employee" means any full-time, part-time, or contract individual employed by CAPL or Holiday, as applicable, at their respective locations identified in Appendix A of this Order, as of July 10, 2017, or by Respondents at the time of the divestiture required by Paragraph II. of this Order and whose job responsibilities primarily relate or related to the Retail Fuel Outlet Business.

DD.    "Retail Fuel Location" means: (1) any facility engaged in the retail sale, promotion, marketing, and provision of Fuel Products and other fuels, automotive services, and related services; and (2) any property site where construction of a retail facility to be engaged in the retail sale, promotion, marketing, and provision of Fuel Products and other fuels, automotive services, and related services is planned or underway.

EE.    "Retail Fuel Outlet Business" means all business activities conducted by CAPL or Holiday, as applicable, prior to the Acquisition Date at or relating to each of CAPL's or Holiday's respective locations identified in Appendix A of this Order, including, but not limited to: (1) the retail sale, promotion, marketing, and provision of Fuel Products, and other fuels, automotive products, and related services; and (2) the operation of associated convenience stores and related businesses and services, including, but not limited to the retail sale, promotion, marketing and provision of food and grocery products (including dairy and bakery items, snacks, gum, and candy), foodservice and quick-serve restaurant items, beverages (including alcoholic beverages), tobacco products, general merchandise, ATM services, gaming and lottery tickets and services, money order services, car wash services, and all other businesses and services associated with the business operated or to be operated at each location identified in Appendix A of this Order.

FF.    "Retained Assets" means:

1.    Respondents' Brands, except with respect to any purchased Inventories (including private label inventory);

2.    Tangible assets that are not located at any site of the Retail Fuel Outlet Business (unless included in the Retail Fuel Assets pursuant to Paragraph I.BB.2.); and

3.    Intellectual property; *provided, however,* that the Retained Assets shall not include software that cannot readily be purchased or licensed from sources other than Respondents or that has been materially modified (other than through user preference settings).

GG.    "Third Party(ies)" means any Person other than the Respondents or an Acquirer.

HH.    "Transition Services" means technical services, personnel, assistance, training, the supply of Products, and other logistical, administrative, and other transitional support as required by an Acquirer and approved by the Commission to facilitate the transfer of the Retail Fuel Assets from the Respondents to an Acquirer, including, but not limited to, services,

training, personnel, and support related to: audits, finance and accounting, accounts receivable, accounts payable, employee benefits, payroll, pensions, human resources, information technology and systems, maintenance and repair of facilities and equipment, Fuel Products supply, purchasing, quality control, R&D support, technology transfer, use of Respondents' Brands for transitional purposes, operating permits and licenses, regulatory compliance, sales and marketing, customer service, and supply chain management and customer transfer logistics.

II. "Transition Services Agreement(s)" means any agreements that receive the prior approval of the Commission between Respondents and an Acquirer to provide, at the option of the Acquirer, Transition Services (or training for an Acquirer to provide services for itself), necessary to transfer the Retail Fuel Assets to the Acquirer and to operate the Retail Fuel Outlet Businesses in a manner consistent with the purposes of this Order.

## II.

**IT IS FURTHER ORDERED** that:

A. No later than 120 days from the date this Order is issued, Respondents shall divest the Retail Fuel Assets, absolutely and in good faith, at no minimum price, as an on-going business, to an Acquirer or Acquirers that receive the prior approval of the Commission and in a manner that receives the prior approval of the Commission.

B. No later than the Divestiture Date of the Retail Fuel Assets, Respondents shall obtain, at their sole expense, all Consents from Third Parties and all Governmental Permits that are necessary to effect the complete transfer and divestiture of the Retail Fuel Assets to the Acquirer and for the Acquirer to operate any aspect of a Retail Fuel Outlet Business;

*Provided, however,* that:

1. Respondents may satisfy the requirement to obtain all Consents from Third Party(ies) by certifying that the Acquirer has entered into equivalent agreements or arrangements directly with the relevant Third Party(ies) that are acceptable to the Commission, or has otherwise obtained all necessary consents and waivers; and

2. With respect to any Governmental Permits relating to the Retail Fuel Assets that are not transferable, allow the Acquirer to operate the Retail Fuel Assets under Respondents' Governmental Permits pending the Acquirer's receipt of its own Governmental Permits, and provide such assistance as the Acquirer may reasonably request in connection with its efforts to obtain such Governmental Permits.

C.    Respondents shall:

    1.    At the option of the Acquirer, and pursuant to a Transition Services Agreement and in a manner that receives the prior approval of the Commission, provide Transition Services to the Acquirer for a period of twelve (12) months from the Divestiture Date;

    2.    Provide the Transition Services at a price not to exceed Cost and of a quality and quantity sufficient for the Acquirer to operate the Retail Fuel Outlet Business(es) in substantially the same manner as CAPL or Holiday, as applicable, at their respective locations identified in Appendix A of this Order, prior to the Acquisition Date (including the ability to develop new services and products and increase sales of current services and products);

*Provided, however,* that Respondents shall give priority to the Acquirer's requirements for Transition Services over Respondents' own requirements and take all actions that are reasonably necessary to ensure uninterrupted Transition Services;

*Provided further* that (i) Acquirer may terminate any Transition Services at any time upon commercially reasonable notice to the Respondents and without cost or penalty to the Acquirer and (ii) at Acquirer's request, Respondents shall file with the Commission any request for prior approval to extend the term of any Transition Services needed to achieve the purposes of this Order, so long as the total duration of any Transition Services does not exceed eighteen (18) months (including the initial twelve (12) month term); and

*Provided further* that Respondents shall not seek to limit the damages (such as indirect, special, and consequential damages) that Acquirer would be entitled to receive in the event of Respondents' breach of any agreement relating to Transition Services.

D.    At the Acquirer's option, Respondents shall grant a worldwide, royalty-free, fully paid-up license to the Acquirer to use any of Respondents' Brands as are applicable to the Retail Fuel Assets as part of any Transition Services Agreement that Respondents may enter into with the Acquirer, or as may otherwise be allowed pursuant to any Remedial Agreement(s).

E.    The purpose of the divestiture of the Retail Fuel Assets is to ensure the continued use of the assets in the same businesses in which such assets were engaged at the time of the announcement of the Acquisition by Respondents and to remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's Complaint.

### III.

**IT IS FURTHER ORDERED** that:

A.  Respondents shall cooperate and assist with an Acquirer's due diligence investigation of the Retail Fuel Assets and Retail Fuel Outlet Business, including, but not limited to access to any and all personnel, properties, contracts, authorizations, documents, and information customarily provided as part of a due diligence process.

B.  Respondents shall:

   1.  No later than twenty (20) days before the Divestiture Date (i) identify each Retail Fuel Employee; (ii) allow a Proposed Acquirer to inspect the personnel files and other documentation of each Retail Fuel Employee, to the extent permissible under applicable laws; and (iii) allow a Proposed Acquirer an opportunity to meet with any Retail Fuel Employee outside the presence or hearing of Respondents, and to make an offer of employment;

   2.  Remove any contractual impediments that may deter any Retail Fuel Employee from accepting employment with an Acquirer, including, any non-compete or confidentiality provision of an employment contract;

   3.  Vest all current and accrued benefits under Respondents' retirement plans as of the date of transition of employment with an Acquirer for any Retail Fuel Employee who accepts an offer of employment from an Acquirer; and provide each Retail Fuel Employee with a reasonable financial incentive as necessary to accept an offer of employment with an Acquirer; and

   4.  Not offer any incentive to any Retail Fuel Employee to decline employment with an Acquirer or otherwise interfere, directly or indirectly, with the recruitment, hiring, or employment of any Retail Fuel Employee by an Acquirer.

C.  For a period of one (1) year after Divestiture Date, Respondents shall not solicit or induce any Retail Fuel Employee who has accepted an offer of employment with an Acquirer to terminate such employment; *provided, however,* that Respondents may (i) advertise for employees in newspapers, trade publications, or other media not targeted specifically at the Retail Fuel Employees; (ii) hire Retail Fuel Employees if employment has been terminated by an Acquirer or who apply for employment with Respondents, so long as such Retail Fuel Employees were not solicited by Respondents in violation of this paragraph; or (iii) hire any Retail Fuel Employees if the Acquirer has notified Respondents in writing that the Acquirer does not intend to make an offer of employment to that Retail Fuel Employee, or where such an offer has been made and the Retail Fuel Employee has declined the offer.

**IV.**

**IT IS FURTHER ORDERED** that:

A.  Respondents shall (i) not disclose (including as to Respondents' employees) and (ii) not use for any reason or purpose, any Confidential Business Information received or maintained by Respondents relating to the Retail Fuel Assets, Retail Fuel Outlet Business, and the post-divestiture Retail Fuel Outlet Business; *provided, however,* that Respondents may disclose or use such Confidential Business Information in the course of:

  1.  Performing their obligations or as permitted under this Order, the Order to Maintain Assets, or the Divestiture Agreement; or

  2.  Complying with financial reporting requirements, obtaining legal advice, prosecuting or defending legal claims, investigations, or enforcing actions threatened or brought against the Retail Fuel Assets, Retail Fuel Outlet Business or the post-divestiture Retail Fuel Outlet Business, or as required by law.

B.  If disclosure or use of any Confidential Business Information is permitted to Respondents' employees or to any other Person under Paragraph IV.A. of this Order, Respondents shall limit such disclosure or use (i) only to the extent such information is required, (ii) only to those employees or Persons who require such information for the purposes permitted under Paragraph IV.A., and (iii) only after such employees or Persons have signed an agreement to maintain the confidentiality of such information.

C.  Respondents shall enforce the terms of this Paragraph IV. as to their employees or any other Person, and take such action as is necessary to cause each of their employees and any other Person to comply with the terms of this Paragraph IV., including implementation of access and data controls, training of employees, and all other actions that Respondents would take to protect their own trade secrets and proprietary information.

**V.**

**IT IS FURTHER ORDERED** that:

A.  At any time after Respondents sign the Consent Agreement, the Commission may appoint David Mock to serve as Monitor to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by this Order, the Order to Maintain Assets, and the Divestiture Agreement, including any Transition Services Agreement approved by the Commission.

B.   Respondents shall enter into an agreement with the Monitor, subject to the prior approval of the Commission, that (i) shall become effective no later than one (1) day after the date the Commission appoints the Monitor, and (ii) confers upon the Monitor all rights, powers, and authority necessary to permit the Monitor to perform his duties and responsibilities on the terms set forth in this Order and in consultation with the Commission:

1.   The Monitor shall have the power and authority to monitor Respondents' compliance with the obligations set forth in this Order and the Order to Maintain Assets, and shall act in a fiduciary capacity for the benefit of the Commission;

2.   Respondents shall (i) ensure that the Monitor has full and complete access to all Respondents' personnel, books, records, documents, and facilities relating to compliance with this Order and the Order to Maintain Assets or to any other relevant information as the Monitor may reasonably request, and (ii) cooperate with, and take no action to interfere with or impede the ability of, the Monitor to perform his duties pursuant to this Order and the Order to Maintain Assets;

3.   The Monitor (i) shall serve at the expense of Respondents, without bond or other security, on such reasonable and customary terms and conditions as the Commission may set, and (ii) may employ, at the cost and expense of Respondents, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities;

4.   Respondents shall indemnify the Monitor and hold him harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of his duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from the Monitor's gross negligence or willful misconduct; and

5.   Respondents may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

C.   The Monitor shall report in writing to the Commission (i) every thirty (30) days after this Order is issued, (ii) no later than ten (10) days after Respondents have completed their obligations as required by Paragraph II. of this Order ("Final Report"), and (iii) at any other time as requested by the staff of the Commission, concerning Respondents' compliance with this Order and/or the Order to Maintain Assets.

D.    The Commission may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a confidentiality agreement related to Commission materials and information received in connection with the performance of the Monitor's duties.

E.    The Monitor's power and duties shall terminate ten (10) business days after the Monitor has completed his final report pursuant to Paragraph V.C.(ii) of this Order, or at such other time as directed by the Commission.

F.    If at any time the Commission determines that the Monitor has ceased to act or failed to act diligently, or is unwilling or unable to continue to serve, the Commission may appoint a substitute Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld:

   1.    If Respondents have not opposed, in writing, including the reasons for opposing, the selection of the substitute Monitor within five (5) days after notice by the staff of the Commission to Respondents of the identity of any substitute Monitor, then Respondents shall be deemed to have consented to the selection of the proposed substitute Monitor; and

   2.    Respondents shall, no later than five (5) days after the Commission appoints a substitute Monitor, enter into an agreement with the substitute Monitor that, subject to the approval of the Commission, confers on the substitute Monitor all the rights, powers, and authority necessary to permit the substitute Monitor to perform his or her duties and responsibilities pursuant to this Order on the same terms and conditions as provided in this Paragraph V.

G.    The Commission may on its own initiative or at the request of the Monitor issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order.

## VI.

**IT IS FURTHER ORDERED** that:

A.    If Respondents have not fully complied with the divestiture and other obligations as required by Paragraph II. of this Order, the Commission may appoint a Divestiture Trustee to divest the Retail Fuel Assets and perform Respondents' other obligations in a manner that satisfies the requirements of this Order.  The Divestiture Trustee appointed pursuant to this Paragraph may be the same Person appointed as Monitor.

B.    In the event that the Commission or the Attorney General brings an action pursuant to § 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), or any other statute enforced by the Commission, Respondents shall consent to the appointment of a Divestiture Trustee in such action to divest the relevant assets in accordance with the terms of this Order.  Neither the appointment of a Divestiture Trustee nor a decision not

to appoint a Divestiture Trustee under this Paragraph shall preclude the Commission or the Attorney General from seeking civil penalties or any other relief available to it, including a court-appointed Divestiture Trustee, pursuant to § 5(*l*) of the Federal Trade Commission Act, or any other statute enforced by the Commission, for any failure by the Respondents to comply with this Order.

C.     The Commission shall select the Divestiture Trustee, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  The Divestiture Trustee shall be a person with experience and expertise in acquisitions and divestitures.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of any proposed Divestiture Trustee within ten (10) days after notice by the staff of the Commission to Respondents of the identity of any proposed Divestiture Trustee, Respondents shall be deemed to have consented to the selection of the proposed Divestiture Trustee.

D.     Within ten (10) days after appointment of a Divestiture Trustee, Respondents shall execute a trust agreement that, subject to the prior approval of the Commission, transfers to the Divestiture Trustee all rights and powers necessary to permit the Divestiture Trustee to effect the relevant divestiture or other action required by the Order.

E.     If a Divestiture Trustee is appointed by the Commission or a court pursuant to this Order, Respondents shall consent to the following terms and conditions regarding the Divestiture Trustee's powers, duties, authority, and responsibilities:

1.     Subject to the prior approval of the Commission, the Divestiture Trustee shall have the exclusive power and authority to assign, grant, license, divest, transfer, deliver, or otherwise convey the relevant assets that are required by this Order to be assigned, granted, licensed, divested, transferred, delivered, or otherwise conveyed, and to take such other action as may be required to divest the Retail Fuel  Assets and perform Respondents' other obligations in a manner that satisfies the requirements of this Order;

2.     The Divestiture Trustee shall have twelve (12) months from the date the Commission approves the trustee agreement described herein to accomplish the divestiture, which shall be subject to the prior approval of the Commission.  If, however, at the end of the twelve (12) month period, the Divestiture Trustee has submitted a plan of divestiture or believes that the divestiture can be achieved within a reasonable time, the divestiture period may be extended by the Commission, or in the case of a court-appointed Divestiture Trustee, by the court;

3.     Subject to any demonstrated legally recognized privilege, the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities related to the relevant assets that are required to be assigned, granted, licensed, divested, delivered, or otherwise conveyed by this Order and to any other relevant information, as the Divestiture Trustee may request.  Respondents shall develop such financial or other information as the Divestiture Trustee may request and

shall cooperate with the Divestiture Trustee.  Respondents shall take no action to interfere with or impede the Divestiture Trustee's accomplishment of the divestiture.  Any delays in divestiture caused by Respondents shall extend the time for divestiture under this Paragraph VI. in an amount equal to the delay, as determined by the Commission or, for a court-appointed Divestiture Trustee, by the court;

4.      The Divestiture Trustee shall use commercially reasonable best efforts to negotiate the most favorable price and terms available in each contract that is submitted to the Commission, subject to Respondents' absolute and unconditional obligation to divest expeditiously and at no minimum price.  The divestiture shall be made in the manner and to an Acquirer as required by this Order; *provided, however,* if the Divestiture Trustee receives bona fide offers from more than one acquiring entity, and if the Commission determines to approve more than one such acquiring entity, the Divestiture Trustee shall divest to the acquiring entity selected by Respondents from among those approved by the Commission; *provided further*, *however,* that Respondents shall select such entity within five (5) days of receiving notification of the Commission's approval;

5.      The Divestiture Trustee shall serve, without bond or other security, at the cost and expense of Respondents, on such reasonable and customary terms and conditions as the Commission or a court may set.  The Divestiture Trustee shall have the authority to employ, at the cost and expense of Respondents, such consultants, accountants, attorneys, investment bankers, business brokers, appraisers, and other representatives and assistants as are necessary to carry out the Divestiture Trustee's duties and responsibilities.  The Divestiture Trustee shall account for all monies derived from the divestiture and all expenses incurred.  After approval by the Commission and, in the case of a court-appointed Divestiture Trustee, by the court, of the account of the Divestiture Trustee, including fees for the Divestiture Trustee's services, all remaining monies shall be paid at the direction of the Respondents, and the Divestiture Trustee's power shall be terminated.  The compensation of the Divestiture Trustee shall be based at least in significant part on a commission arrangement contingent on the divestiture of all of the relevant assets that are required to be divested by this Order;

6.      Respondents shall indemnify the Divestiture Trustee and hold the Divestiture Trustee harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Divestiture Trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence or willful misconduct by the Divestiture Trustee.  For purposes of this Paragraph VI.E.6., the term "Divestiture Trustee" shall include all Persons retained by the Divestiture Trustee pursuant to Paragraph VI.E.5. of this Order;

7.    The Divestiture Trustee shall have no obligation or authority to operate or maintain the Retail Fuel Assets required to be divested by this Order;

8.    The Divestiture Trustee shall report in writing to Respondents and to the Commission every sixty (60) days concerning the Divestiture Trustee's efforts to accomplish the divestiture; and

9.    Respondents may require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however,* such agreement shall not restrict the Divestiture Trustee from providing any information to the Commission.

F.    The Commission may require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, and other representatives and assistants to sign a confidentiality agreement related to Commission materials and information received in connection with the performance of the Divestiture Trustee's duties.

G.    If the Commission determines that a Divestiture Trustee has ceased to act or failed to act diligently, the Commission may appoint a substitute Divestiture Trustee in the same manner as provided in this Paragraph VI.

H.    The Commission or, in the case of a court-appointed Divestiture Trustee, the court, may on its own initiative or at the request of the Divestiture Trustee issue such additional orders or directions as may be necessary or appropriate to accomplish the divestitures and other obligations or action required by this Order.

## VII.

**IT IS FURTHERED ORDERED** that:

A.    For a period of ten (10) years from the date this Order is issued, Respondents shall not, without providing advance written notification to the Commission ("Notification") in the manner described in this paragraph, acquire, directly or indirectly, through subsidiaries or otherwise, any leasehold, ownership interest, or any other interest, in whole or in part, in any Prior Notice Outlet.

B.    With respect to the Notification:

1.    The prior notification required by this Paragraph VII. shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended (hereinafter referred to as "the Notification"), and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such notification, notification shall be filed with the Secretary of the Commission, notification need not be made to the United States Department of Justice, and

notification is required only of the Respondents and not of any other party to the transaction.

2. Respondents shall include a description of the proposed acquisition and provide:

 (a) A map showing all retail fuel outlets by ownership (*e.g.*, OPIS Corporate Brand) within five (5) driving miles of the relevant Prior Notice Outlet;

 (b) For each retail fuel outlet owned by Respondents within five (5) driving miles of the relevant Prior Notice Outlet, a list of the retail fuel outlets that Respondents monitored at any time within the preceding twelve (12) month period (to the extent such information is available); and

 (c) Respondents' pricing strategy in relation to each monitored retail fuel outlet identified in response to Paragraph VII.B.2.(b) of this Order.

3. Respondents shall provide the Notification to the Commission at least thirty (30) days prior to consummating the transaction (hereinafter referred to as the "first waiting period").  If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 803.20), Respondents shall not consummate the transaction until thirty (30) days after submitting such additional information or documentary material.

4. Early termination of the waiting periods in this Paragraph VII. may be requested and, where appropriate, granted by letter from the Bureau of Competition. *Provided, however*, that prior notification shall not be required by this Paragraph for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a.

## VIII.

**IT IS FURTHERED ORDERED** that:

A. The Divestiture Agreement shall be incorporated by reference into this Order and made a part hereof, and Respondents shall comply with all terms of the Divestiture Agreement. Any failure by Respondents to comply with the terms of a Divestiture Agreement shall constitute a violation of this Order.  The Divestiture Agreement shall not limit or contradict, or be construed to limit or contradict, the terms of this Order.  In the event of a conflict between the terms of this Order and a Divestiture Agreement, or any ambiguity in the language used in a Divestiture Agreement, the terms of this Order shall govern to resolve such conflict or ambiguity.

B.     Respondents shall not modify, replace, or extend the terms of the Divestiture Agreement without the prior approval of the Commission, except as otherwise provided in Rule 2.41(f)(5) of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 2.41(f)(5).

## IX.

**IT IS FURTHER ORDERED** that:

A.     Respondents shall file a verified written report with the Commission setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with this Order:

    1.    Thirty (30) days from the date this Order is issued and every thirty (30) days thereafter until Respondents have fully complied with the provisions of Paragraph II. of this Order; and

    2.    No later than one (1) year after the date this Order is issued and annually thereafter until this Order terminates, and at such other times as the Commission or its staff may request.

B.     With respect to the divestiture required by Paragraph II.A. of this Order, Respondents shall include in its compliance reports (i) the status of the divestiture and transfer of any of the Retail Fuel Assets; (ii) a description of all substantive contacts with a proposed acquirer; and (iii) as applicable, a statement that the divestiture approved by the Commission has been accomplished, including a description of the manner in which Respondents have completed such divestiture and the date the divestiture was accomplished.

## X.

**IT IS FURTHER ORDERED** that Respondents shall notify the Commission at least thirty (30) days prior to:

A.     Any proposed dissolution of the Respondents;

B.     Any proposed acquisition, merger, or consolidation of the Respondents; or

C.     Any other change in the Respondents, including, but not limited to, assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## XI.

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and upon five (5) days' notice to Respondents, Respondents shall, without restraint or interference, permit any duly authorized representative of the Commission:

A.     Access, during business office hours of the Respondents and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda and all other records and documents in the possession, or under the control, of the Respondents related to compliance with this Order, which copying services shall be provided by the Respondents at their expense; and

B.     To interview officers, directors, or employees of the Respondents, who may have counsel present, regarding such matters.

## XII.

**IT IS FURTHER ORDERED** that this Order shall terminate on February 15, 2028.

By the Commission.


Donald S. Clark
Secretary

SEAL:
ISSUED: February 15, 2018

**Public Appendix A**

**Retail Fuel and Convenience Store Properties To Be Divested**

| Owner | State | Area | Property Name & Address |
|---|---|---|---|
| ACT | Minnesota | Aitkin | Freedom Valu<br>13 2nd Street NW<br>Aitkin, Minnesota  56431 |
| ACT | Minnesota | Hibbing | Freedom Valu<br>1135 E. 37th Street<br>Hibbing, Minnesota  55746 |
| ACT | Minnesota | Minnetonka | Freedom Valu<br>17516 Highway 7<br>Minnetonka, Minnesota  55345 |
| ACT | Minnesota | Mora | Freedom Valu<br>900 Highway 65 S<br>Mora, Minnesota  55051 |
| ACT | Minnesota | St. Paul | Super America<br>1015 Geneva Avenue N<br>St. Paul, Minnesota  55128 |
| ACT | Minnesota | St. Paul | Freedom Valu<br>2490 County Road FE<br>St. Paul, Minnesota  55110 |
| Holiday | Minnesota | St. Peter | Holiday<br>123 Saint Julien Street<br>St. Peter, Minnesota  56082 |
| ACT | Wisconsin | Hayward | Holiday<br>15771 Highway 63<br>Hayward, Wisconsin  54843 |
| ACT | Wisconsin | Siren | Holiday<br>24184 WI State Route 35<br>Siren, Wisconsin  54872 |
| ACT | Wisconsin | Spooner | Holiday<br>730 S. River Street<br>Spooner, Wisconsin  54801 |

**Non-Public Appendix B**

**Prior Notice Outlets**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

1710184

# UNITED STATES OF AMERICA
# BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      **Maureen K. Ohlhausen, Acting Chairman**
                    **Terrell McSweeny**

| | |
|---|---|
| **In the Matter of** ) | |
| ) | |
| **Alimentation Couche-Tard Inc.,** ) | **Docket No. C-4635** |
| **a corporation; and** ) | |
| ) | |
| **CrossAmerica Partners LP,** ) | |
| **a limited partnership.** ) | |

## ORDER TO MAINTAIN ASSETS

The Federal Trade Commission ("Commission"), having initiated an investigation of the proposed acquisition by Respondent Alimentation Couche-Tard Inc. ("ACT") (through its wholly owned subsidiary Oliver Acquisition Corp.) of certain equity interests of Holiday Companies subsidiaries, and ACT and its affiliate CrossAmerica Partners LP (together, "Respondents") having been furnished thereafter with a copy of a draft of the Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts set forth in the aforesaid draft of the Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined to accept the executed Consent Agreement and to place such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, now in further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the Commission hereby issues its Complaint, makes the following jurisdictional findings, and issues this Order to Maintain Assets:

1.      Respondent Alimentation Couche-Tard Inc. is a corporation organized, existing, and doing business under, and by virtue of, the laws of Canada, with its office and principal place of business located at 4204 Industriel Blvd., Laval, Quebec H7L 0E3, Canada, and its United States address for service of process and of the Complaint, the Decision and Order, and the Order to Maintain Assets, as follows:  Corporate Secretary, Circle K Stores Inc., 1130 W. Warner Road, Tempe, Arizona 85284.

2.      Respondent CrossAmerica Partners LP is a limited partnership organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business located at 515 Hamilton Street, Suite 200 Allentown, Pennsylvania 18101.

3.      The Federal Trade Commission has jurisdiction over the subject matter of this proceeding and over the Respondents and the proceeding is in the public interest.

## I.

**IT IS ORDERED** that, as used in this Order to Maintain Assets, the following definitions, and all other definitions used in the Consent Agreement and the Decision and Order, which are incorporated herein by reference and made a part hereof, shall apply:

A.      "ACT" means Alimentation Couche-Tard Inc., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates, in each case controlled by ACT (including Circle K Stores Inc., Oliver Acquisition Corp., and CrossAmerica Partners LP), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B.      "CAPL" means CrossAmerica Partners LP, its partners, directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates, in each case controlled by CAPL, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

C.      "Holiday" means Holiday Companies, a corporation organized, existing, and doing business under, and by virtue of the laws of the State of Minnesota, with its office and principal place of business located at 4567 American Boulevard West, Minneapolis, Minnesota 55437.

D.      "Commission" means the Federal Trade Commission.

E.      "Acquirer" means any Person that acquires any of the Retail Fuel Assets pursuant to the Decision and Order.

F.  "Acquisition" means the proposed acquisitions described in the Equity Interest Purchase Agreement by and among Holiday Companies and Oliver Acquisition Corp., dated as of July 10, 2017.

G.  "Acquisition Date" means the date the Acquisition is consummated.

H.  "Books and Records" means all originals and all copies of any operating, financial, environmental, governmental compliance, regulatory, or other information, documents, data, databases, printouts, computer files (including files stored on a computer's hard drive or other storage media), electronic files, books, records, ledgers, papers, instruments, and other materials, whether located, stored, or maintained in traditional paper format or by means of electronic, optical, or magnetic media or devices, photographic or video images, or any other format or media, relating to the Retail Fuel Assets, including, but not limited to, real estate files; environmental reports; environmental liability claims and reimbursement data, information, and materials; underground storage tank (UST) system registrations and reports; registrations, licenses, and permits (to the extent transferable); regulatory compliance records, data, and files; applications, filings, submissions, communications, and correspondence with Governmental Entities; inventory data, records, and information; purchase order information and records; supplier, vendor, and procurement files, lists, and related data and information; credit records and information; account information; marketing analyses and research data; service and warranty records; warranties and guarantees; equipment logs, operating guides and manuals; employee lists and contracts, salary and benefits information, and personnel files and records (to the extent permitted by law); financial statements and records; accounting records and documents; telephone numbers and fax numbers; and all other documents, information, and files of any kind that are necessary for an Acquirer to operate the Retail Fuel Outlet Business(es) in a manner consistent with the purposes of the Decision and Order.

I.  "Confidential Business Information" means all information owned by, or in the possession or control of, Respondents that is not in the public domain and to the extent that it is related to or used in connection with the Retail Fuel Assets or the conduct of the Retail Fuel Outlet Business(es). The term "Confidential Business Information" excludes the following:

  1.  Information that is contained in documents, books, or records of Respondents that is provided to an Acquirer that is unrelated to the Retail Fuel Assets or that is exclusively related to the Respondents' retained businesses; and

  2.  Information that: (a) is or becomes generally available to the public other than as a result of disclosure in breach of the prohibitions of the Orders; (b) is or was developed independently of, and without reference to, any Confidential Business Information; (c) is necessary to be included in Respondents' mandatory regulatory filings; (d) the disclosure of which is consented to by an Acquirer; (e) is necessary to be exchanged in the course of consummating the Acquisition or transactions pursuant to the Divestiture Agreement; (f) is disclosed in complying with the Or-

3

ders; (g) the disclosure of which is necessary to allow Respondents to comply with the requirements and obligations of the laws of the United States and other countries, and decisions of Governmental Entities; or (h) is disclosed in obtaining legal advice.

J.     "Consent" means any approval, consent, ratification, waiver, or other authorization.

K.     "Contract(s)" means all agreements, contracts, licenses, leases (including, but not limited to, ground leases and subleases), consensual obligations, binding commitments, promises and undertakings (whether written or oral and whether express or implied), whether or not legally binding.

L.     "Decision and Order" means the:

1.     Proposed Decision and Order contained in the Consent Agreement in this matter until the issuance of a final and effective Decision and Order by the Commission; and

2.     Final Decision and Order issued by the Commission following the issuance and service of a final Decision and Order by the Commission in this matter.

M.     "Divestiture Agreement" means any agreement between Respondents (or between a Divestiture Trustee) and an Acquirer to divest the Retail Fuel Assets and any ancillary agreements relating to the divestiture of the relevant assets (such as for the provision of Transition Services) that has been approved by the Commission pursuant to the Decision and Order, including all amendments, exhibits, agreements, and schedules thereto.

N.     "Divestiture Date" means the date on which Respondents (or the Divestiture Trustee) close on a transaction to divest the Retail Fuel Assets.

O.     "Divestiture Trustee" means the Person appointed by the Commission pursuant to Paragraph VI. of the Decision and Order.

P.     "Fuel Products" means refined petroleum gasoline and diesel products.

Q.     "Governmental Entity" means any federal, state, local, or non-U.S. government, or any court, legislature, governmental agency or commission, or any judicial or regulatory authority of any government.

R.     "Governmental Permit(s)" means all Consents, licenses, permits, approvals, registrations, certificates, rights, or other authorizations from any Governmental Entity(ies) necessary to effect the complete transfer and divestiture of the Retail Fuel Assets to an Acquirer and for such Acquirer to operate any aspect of a Retail Fuel Outlet Business.

S.   "Inventories" means all inventories of every kind and nature for retail sale associated with the Retail Fuel Assets, including: (1) all Fuel Products, kerosene, and other petroleum-based motor fuels stored in bulk and held for sale to the public; and (2) all usable, non-damaged and non-out of date products and items held for sale to the public, including, without limitation, all food-related items requiring further processing, packaging, or preparation and ingredients from which prepared foods are made to be sold.

T.   "Monitor" means any Person appointed by the Commission to serve as a Monitor pursuant to Paragraph IV. of this Order to Maintain Assets.

U.   "Orders" means the Decision and Order in this matter and this Order to Maintain Assets.

V.   "Person" means any individual, or any partnership, joint venture, firm, corporation, limited liability company, limited liability partnership, joint stock company, association, trust, unincorporated organization, or other business entity.

W.   "Products" means any Fuel Products or merchandise products relating to the Retail Fuel Outlet Business(es).

X.   "Respondents' Brands" means all of Respondents' trademarks, trade dress, logos, service marks, trade names, brand names, and all associated intellectual property rights, including rights to the names "Circle K," "Freedom Valu," and "Holiday."

Y.   "Retail Fuel Assets" means the assets defined in Paragraph I.BB. of the Decision and Order.

Z.   "Retail Fuel Employee" means any full-time, part-time, or contract individual employed by CAPL or Holiday, as applicable, at their respective locations identified in Appendix A of this Order, as of July 10, 2017, or by Respondents at the time of the divestiture required by Paragraph II. of this Order to Maintain Assets and whose job responsibilities primarily relate or related to the Retail Fuel Outlet Business.

AA.   "Retail Fuel Outlet Business" means all business activities conducted by CAPL or Holiday, as applicable, prior to the Acquisition Date at or relating to each of CAPL's or Holiday's respective locations identified in Appendix A of this Order, including, but not limited to: (1) the retail sale, promotion, marketing, and provision of Fuel Products, and other fuels, automotive products, and related services; and (2) the operation of associated convenience stores and related businesses and services, including but not limited to the retail sale, promotion, marketing and provision of food and grocery products (including dairy and bakery items, snacks, gum, and candy), foodservice and quick-serve restaurant items, beverages (including alcoholic beverages), tobacco products, general merchandise, ATM services, gaming and lottery tickets and services, money order services, car wash services, and all other businesses and services associated with the business operated or to be operated at each location identified in Appendix A of this Order to Maintain Assets.

5

BB.   "Transition Services" means technical services, personnel, assistance, training, the supply of Products, and other logistical, administrative, and other transitional support as required by an Acquirer and approved by the Commission to facilitate the transfer of the Retail Fuel Assets from the Respondents to an Acquirer, including, but not limited to, services, training, personnel, and support related to: audits, finance and accounting, accounts receivable, accounts payable, employee benefits, payroll, pensions, human resources, information technology and systems, maintenance and repair of facilities and equipment, Fuel Products supply, purchasing, quality control, R&D support, technology transfer, use of Respondents' Brands for transitional purposes, operating permits and licenses, regulatory compliance, sales and marketing, customer service, and supply chain management and customer transfer logistics.

CC.   "Transition Services Agreement(s)" means any agreements that receive the prior approval of the Commission between Respondents and an Acquirer to provide, at the option of the Acquirer, Transition Services (or training for an Acquirer to provide services for itself), necessary to transfer the Retail Fuel Assets to the Acquirer and to operate the Retail Fuel Outlet Businesses in a manner consistent with the purposes of the Orders.

## II.

**IT IS FURTHER ORDERED** that from the date Respondents execute the Consent Agreement until the Divestiture Date:

A.   Respondents shall maintain the viability, marketability, and competitiveness of the Retail Fuel Assets, and shall not cause the wasting or deterioration of any of the Retail Fuel Assets.  Respondents shall not cause the Retail Fuel Assets to be operated in a manner inconsistent with applicable laws, nor shall they sell, transfer, encumber, or otherwise impair the viability, marketability, or competitiveness of the Retail Fuel Assets.

B.   Respondents shall conduct or cause the business of the Retail Fuel Assets to be conducted in the regular and ordinary course of business, in accordance with past practice (including regular repair and maintenance efforts) and shall use best efforts to preserve the existing relationships with suppliers, customers, employees, and others having business relations with the Retail Fuel Assets in the regular and ordinary course of business, in accordance with past practice.

C.   Respondents shall not terminate the operation of any of the Retail Fuel Assets, and shall continue to maintain the Inventory of each of the Retail Fuel Assets at levels and selections in the regular and ordinary course of business, in accordance with past practice.

D.   Respondents shall maintain the organization and properties of each of the Retail Fuel Assets, including current business operations, physical facilities, working conditions, staffing levels, and a work force of equivalent size, training, and expertise associated with

each of the Retail Fuel Assets.  Among other actions as may be necessary to comply with these obligations, Respondents shall, without limitation:

1.  Maintain all operations at each of the Retail Fuel Assets in the regular and ordinary course of business, in accordance with past practice, including maintaining customary hours of operation and departments;

2.  Use best efforts to retain employees at each of the Retail Fuel Assets; when vacancies occur, replace the employees in the regular and ordinary course of business, in accordance with past practice; and not transfer any employees from any of the Retail Fuel Assets;

3.  Provide each employee of the Retail Fuel Assets with reasonable financial incentives, including continuation of all employee benefits and regularly scheduled raises and bonuses, to continue in his or her position pending divestiture of the Retail Fuel Assets;

4.  Not transfer Inventory from any Retail Fuel Asset, other than in the regular and ordinary course of business, in accordance with past practice;

5.  Make all payments required to be paid under any Contract when due, and otherwise pay all liabilities and satisfy all obligations associated with each of the Retail Fuel Assets, in each case in a manner in accordance with past practice;

6.  Maintain the Books and Records of each of the Retail Fuel Assets;

7.  Not display any signs or conduct any advertising (*e.g.*, direct mailing, point-of-purchase coupons) that indicates that any Respondent is moving its operations at any Retail Fuel Asset to another location, or that indicates a Retail Fuel Asset will close;

8.  Not conduct any "going out of business," "close-out," "liquidation," or similar sales or promotions at or relating to any Retail Fuel Asset;

9.  Continue existing pricing or advertising practices, including marketing programs and policies, merchandising programs and policies, and price zones for or applicable to any of the Retail Fuel Assets, other than changes or modifications in the regular and ordinary course of business, in accordance with past practices and business strategy;

10.  Provide each of the Retail Fuel Assets with sufficient working capital to operate at least at current rates of operation, to meet all capital calls with respect to such businesses, and to carry on, at least at their scheduled pace, all capital projects, business plans, and promotional activities for each of the Retail Fuel Assets;

7

11.     Continue, at least at their scheduled pace, any additional expenditures for each of the Retail Fuel Assets authorized prior to the date the Consent Agreement was signed by Respondents including, but not limited to, all repairs, renovations, distribution, marketing, and sales expenditures;

12.     Provide such resources as may be necessary to respond to competition and to prevent any diminution in sales at each of the Retail Fuel Assets;

13.     Make available for use by each of the Retail Fuel Assets funds sufficient to perform all routine maintenance and all other maintenance as may be necessary to, and all replacements of, any assets related to the operation of the Retail Fuel Assets;

14.     Provide support services to each of the Retail Fuel Assets at least at the level as were being provided to such Retail Fuel Assets by Respondents as of the date the Consent Agreement was signed by Respondents; and

15.     Maintain, and not terminate or permit the lapse of, any Governmental Permits necessary for the operation of any Retail Fuel Asset;

*Provided, however,* that it shall not be a violation of Paragraph II.D. if Respondents take actions that have been requested or agreed to by the Acquirer, in writing, and approved in advance by the Monitor (in consultation with Commission staff), in all cases to facilitate the Acquirer's acquisition of the Retail Fuel Assets and consistent with the purposes of the Orders.

E.     The purpose of this Order to Maintain Assets is to: (1) maintain and preserve the Retail Fuel Assets as viable, marketable, competitive, and ongoing businesses until the divestiture required by the Decision and Order is achieved; (2) ensure that no Confidential Business Information is disclosed to or received, accessed, or used by Respondents or Respondents' employees except in accordance with the provisions of the Orders; (3) prevent interim harm to competition pending the divestiture and other relief; and (4) remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's Complaint.

## III.

**IT IS FURTHER ORDERED** that, pending divestiture of the Retail Fuel Assets,

A. Respondents shall not, and shall assure that its employees, agents, and representatives shall not:

    1. Receive, access, have access to, or use, directly or indirectly, any Confidential Business Information, other than as is necessary to:

        a. Comply with the requirements of the Orders;

        b. Perform their obligations to the Acquirer under the terms of any Divestiture Agreement, including providing Transition Services pursuant to a Transition Services Agreement; or

        c. Comply with financial reporting requirements, defend legal claims, or as otherwise required by applicable law; and

    2. Disclose or convey any Confidential Business Information, directly or indirectly, to any Person except (i) the Acquirer, (ii) other Persons specifically authorized by such Acquirer to receive such information, (iii) the Commission, or (iv) the Monitor (if any has been appointed).

B. Respondents shall institute appropriate procedures and requirements to ensure that the above-described employees, agents, and representatives do not (1) use, disclose, or convey, directly or indirectly, any Confidential Business Information in contravention of this Order to Maintain Assets, or (2) solicit, access, or use any Confidential Business Information that they are prohibited from receiving for any reason or purpose.

C. As part of the procedures and requirements that Respondents are required to implement to comply with Paragraphs III.A. and B., not later than (i) thirty (30) days after the date Respondents execute the Consent Agreement or (ii) fifteen (15) days after the date this Order to Maintain Assets is issued by the Commission, whichever is earlier, Respondents shall:

    1. Implement and maintain a process and procedures pursuant to which Confidential Business Information may be disclosed and used only by Respondents' employees, agents, and representatives who (i) require access to such Confidential Business Information in order to provide Transition Services or as otherwise required by the Divestiture Agreement or permitted by the Orders; (ii) only to the extent such Confidential Business Information is required; and (iii) only after such employees, agents, and representatives have signed an appropriate agreement in writing to maintain the confidentiality of such Confidential Business Information; and

2.      Monitor the implementation and enforce the terms of Paragraph III. as to any of Respondents' employees, agents, and representatives, and take such actions as are necessary to cause each such Person to comply with the terms of Paragraph III., including training of Respondents' employees, and all other corrective actions that Respondents would take for the failure of their employees and other personnel to comply with such restrictions, and to protect their own confidential and proprietary information.

**IV.**

**IT IS FURTHER ORDERED** that:

A.      At any time after Respondents sign the Consent Agreement, the Commission may appoint Anthony P. Bartys to serve as Monitor to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by the Orders and the Divestiture Agreement, including any Transition Services Agreement approved by the Commission.

B.      Respondents shall enter into an agreement with the Monitor, subject to the prior approval of the Commission, that (i) shall become effective no later than one (1) day after the date the Commission appoints the Monitor, and (ii) confers upon the Monitor all rights, powers, and authority necessary to permit the Monitor to perform his duties and responsibilities on the terms set forth in this Order and in consultation with the Commission:

1.      The Monitor shall have the power and authority to monitor Respondents' compliance with the obligations set forth in the Orders, and shall act in a fiduciary capacity for the benefit of the Commission;

2.      Respondents shall (i) ensure that the Monitor has full and complete access to all Respondents' personnel, books, records, documents, and facilities relating to compliance with the Orders or to any other relevant information as the Monitor may reasonably request, and (ii) cooperate with, and take no action to interfere with or impede the ability of, the Monitor to perform his duties pursuant to the Orders;

3.      The Monitor (i) shall serve at the expense of Respondents, without bond or other security, on such reasonable and customary terms and conditions as the Commission may set, and (ii) may employ, at the cost and expense of Respondents, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities;

4.      Respondents shall indemnify the Monitor and hold him harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of his duties, including all reasonable fees of counsel and other

10

expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from the Monitor's gross negligence or willful misconduct; and

5. Respondents may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

C. The Monitor shall report in writing to the Commission (i) every thirty (30) days after this Order to Maintain Assets is issued and (ii) at any other time as requested by the staff of the Commission, concerning Respondent's compliance with the Orders.

D. The Commission may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a confidentiality agreement related to Commission materials and information received in connection with the performance of the Monitor's duties.

E. The Monitor's power and duties shall terminate when this Order to Maintain Assets terminates at which time the Monitor's power and duties shall continue pursuant to the Decision and Order, or at such other time as directed by the Commission.

F. If at any time the Commission determines that the Monitor has ceased to act or failed to act diligently, or is unwilling or unable to continue to serve, the Commission may appoint a substitute Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld:

1. If Respondents have not opposed, in writing, including the reasons for opposing, the selection of the substitute Monitor within five (5) days after notice by the staff of the Commission to Respondents of the identity of any substitute Monitor, then Respondents shall be deemed to have consented to the selection of the proposed substitute Monitor; and

2. Respondents shall, no later than five (5) days after the Commission appoints a substitute Monitor, enter into an agreement with the substitute Monitor that, subject to the approval of the Commission, confers on the substitute Monitor all the rights, powers, and authority necessary to permit the substitute Monitor to perform his or her duties and responsibilities pursuant to this Order to Maintain Assets on the same terms and conditions as provided in Paragraph IV.

G. The Commission may on its own initiative or at the request of the Monitor issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order to Maintain Assets.

### V.

**IT IS FURTHER ORDERED** that within thirty (30) days after this Order to Maintain Assets is issued, and every thirty (30) days thereafter until this Order to Maintain Assets terminates, Respondents shall submit to the Commission a verified written report setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with all provisions of this Order to Maintain Assets; *provided, however,* that after the Decision and Order in this matter becomes final and effective, the reports due under this Order to Maintain Assets may be consolidated with and submitted to the Commission on the same timing as the reports required to be submitted by the Respondents pursuant to the Decision and Order. Respondents shall submit at the same time a copy of their reports concerning compliance with this Order to Maintain Assets to the Monitor.  Respondents shall include in their reports, among other things that are required from time to time, a full description of the efforts being made to comply with this Order to Maintain Assets.

### VI.

**IT IS FURTHER ORDERED** that Respondents shall notify the Commission at least thirty (30) days prior to:

A.      Any proposed dissolution of the Respondents;

B.      Any proposed acquisition, merger, or consolidation of the Respondents; or

C.      Any other change in the Respondents, including, but not limited to, assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of the Orders.

### VII.

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order to Maintain Assets, and subject to any legally recognized privilege, and upon written request and upon five (5) days' notice to Respondents, Respondents shall, without restraint or interference, permit any duly authorized representative of the Commission:

A.      Access, during business office hours of the Respondents and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda and all other records and documents in the possession, or under the control, of the Respondents related to compliance with this Order to Maintain Assets, which copying services shall be provided by the Respondents at their expense; and

B.      To interview officers, directors, or employees of the Respondents, who may have counsel present, regarding such matters.

## VIII.

**IT IS FURTHER ORDERED** that this Order to Maintain Assets shall terminate:

A.      Three (3) days after the Commission withdraws its acceptance of the Consent Agreement pursuant to the provisions of Commission Rule 2.34, 16 C.F.R. § 2.34;

B.      The day after Respondents complete the divestiture required by Paragraph II.A. of the Decision and Order; *provided, however,* that if at the time such divestiture has been completed, the Decision and Order in this matter is not yet final, then this Order to Maintain Assets shall terminate the day after the Decision and Order becomes final; or

C.      The day the Commission otherwise directs that this Order to Maintain Assets is terminated.

By the Commission.


Donald S. Clark
Secretary

SEAL:
ISSUED:  December 15, 2017

Appendix A

**Retail Fuel and Convenience Store Properties To Be Divested**

| Owner | State | Area | Property Name & Address |
|-------|-------|------|-------------------------|
| ACT | Minnesota | Aitkin | Freedom Valu<br>13 2nd Street NW<br>Aitkin, Minnesota  56431 |
| ACT | Minnesota | Hibbing | Freedom Valu<br>1135 E. 37th Street<br>Hibbing, Minnesota  55746 |
| ACT | Minnesota | Minnetonka | Freedom Valu<br>17516 Highway 7<br>Minnetonka, Minnesota  55345 |
| ACT | Minnesota | Mora | Freedom Valu<br>900 Highway 65 S<br>Mora, Minnesota  55051 |
| ACT | Minnesota | St. Paul | Super America<br>1015 Geneva Avenue N<br>St. Paul, Minnesota  55128 |
| ACT | Minnesota | St. Paul | Freedom Valu<br>2490 County Road FE<br>St. Paul, Minnesota  55110 |
| Holiday | Minnesota | St. Peter | Holiday<br>123 Saint Julien Street<br>St. Peter, Minnesota  56082 |
| ACT | Wisconsin | Hayward | Holiday<br>15771 Highway 63<br>Hayward, Wisconsin  54843 |
| ACT | Wisconsin | Siren | Holiday<br>24184 WI State Route 35<br>Siren, Wisconsin  54872 |
| ACT | Wisconsin | Spooner | Holiday<br>730 S. River Street<br>Spooner, Wisconsin  54801 |